AO 106 (Rev 04/10) Application for a Search Warrant

FILED
US DISTRICT COURT
WESTERN DISTRICT
OF ARKANSAS
Jan 8, 2024
OFFICE OF THE CLERK

# UNITED STATES DISTRICT COURT
## for the
### Western District of Arkansas

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*
A BLUE COLORED MOTOROLA CELLULAR TELEPHONE, MODEL XT2317-1, TELEPHONE IMEI: 351998772818902

Case No. 2:24-cm-00004

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
See Attachment A

located in the ____Western____ District of ____Arkansas____, there is now concealed *(identify the person or describe the property to be seized)*:
See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. 841(a)(1) | Controlled Substance Offenses |
| 21 U.S.C. 846 | Conspiracy |

The application is based on these facts:
See Attached Affidavit of DEA SA Michael Brooks.

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of ____ days (give exact ending date if more than 30 days: ____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*/s/ M. Brooks*
Applicant's signature

DEA SA Michael Brooks
Printed name and title

Sworn to before me and signed in my presence.

Date: 1/8/24

*/s/ Mark E. Ford*
Judge's signature

City and state: Fort Smith, Arkansas

Hon. Mark E. Ford, U.S. Magistrate Judge
Printed name and title

# ATTACHMENT A

## TARGET TELEPHONE TO BE SEARCHED

1.     One (1) blue colored Motorola cellular telephone, model XT2317-1, with an International Mobile Equipment Identity (IMEI) of 351998772818902;

The cellular telephone described in Attachment A is currently stored as non-drug evidence at the DEA Fort Smith Post of Duty, in Fort Smith, Arkansas.




## ATTACHMENT B

## ATTACHMENT B

1. All records on the Device described in Attachment A that relate to violations of 21 U.S.C. § 841(a)(1) and 846, including but not limited to:

   a. Any and all communications to and from the Device involving the trafficking of controlled substances;

   b. Any and all communications to and from the Device involving Edward GONZALEZ-Limones and Pedro Vinicio CERDA-Aguirre.

   c. Any and all electronic media, photographs, internet browser history or electronic application use indicative of violations of the above-referenced sections of the United States Code; and

2. Evidence of user attribution showing who used or owned the Device at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, electronic application use, and browsing history.

FILED
US DISTRICT COURT
WESTERN DISTRICT
OF ARKANSAS
Jan 8, 2024
OFFICE OF THE CLERK

IN THE UNITED STATES DISTRICT COURT
Western District of Arkansas, Fort Smith Division

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF A BLUE COLORED MOTOROLA CELLULAR TELEPHONE, MODEL XT2317-1, TELEPHONE IMEI: 351998772818902 | 2:24-cm-00004<br><br>**Filed Under Seal** |

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Michael Brooks, being first duly sworn, hereby depose and state as follows:

### PURPOSE OF AFFIDAVIT

1. I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 and 18 U.S.C. §§ 2703(c)(1)(A) for a blue colored Motorola cellular telephone, model XT2317-1, with an International Mobile Equipment Identity (IMEI) of 351998772818902, (hereinafter, referred to as Target Telephone #1), currently stored as evidence within the Drug Enforcement Administration's (DEA) Fort Smith Post of Duty (FSPOD), located in the Western District of Arkansas. Photographs of the target telephone are attached to Attachment A.

2. For the reasons set forth below, your affiant has probable cause to believe that the target telephones contains items that constitute evidence, fruits, and instrumentalities of violations of Title 21, United States Code, Section 841(a)(1)(possession with intent to distribute a controlled substance); and Title 21, United States Code, Section 846 (conspiracy to commit controlled substance offense). Your affiant further submits that a search of the target telephone will result in the discovery of items that constitute evidence, fruits, and instrumentalities of such activity.

3. Based upon your affiant's training, experience, shared experience with other agents and officers with whom he has worked, and participation in other investigations involving large amounts of methamphetamine, cocaine, heroin, fentanyl, marijuana and/or other Controlled Substances, your affiant knows the following to be true:

    a. That drug distributors often purchase and/or title their assets in fictitious names, aliases or the names of relatives, associates or business entities to avoid detection of these assets by law enforcement authorities;

    b. That even though these assets are in names other than the drug distributors', the drug distributors actually own and continue to use these assets, and exercise dominion and control over them;

    c. That drug distributors often possess large amounts of United States currency in order to maintain and finance their on-going drug business;

    d. That it is common for drug distributors to maintain books, records, receipts, notes, ledgers, airline tickets, receipts relating to the purchase of financial instruments and/or the transfer of funds, and other papers relating to the transportation, ordering, sale and distribution of controlled substances. That the aforementioned books, records, receipts, notes, ledgers, etc., are maintained where the traffickers have ready access to them;

    e. That it is common for drug distributors to conceal contraband, proceeds of illegal drug sales, and records of drug transactions in secure locations within their residences, their businesses, their vehicles, and/or other locations which they maintain dominion and control over for ready access, and to conceal these items from law enforcement authorities;

   f. That in-order-to accomplish this concealment, drug distributors frequently build "stash" places within their residences, vehicles, or businesses. There are a number of publications available instructing where and how to build "stash" places. Copies of these types of publications have been found in the residences of drug distributors;

   g. That it is common for persons involved in drug distribution to maintain evidence pertaining to their obtaining, secreting, transfer, concealment, and/or expenditure of narcotics proceeds, such as: currency, financial instruments, precious metals, and gemstones, jewelry, books, records, invoices, receipts, records of real estate transactions, bank statements, and related records, passbooks, money drafts, letters of credit, money orders, bank drafts, cashier's checks, bank checks, safe deposit box keys, and money wrappers. These items are maintained by the drug distributors within their residences, vehicles, businesses or other locations, which they maintain dominion and control over;

   h. That drug distributors often utilize electronic equipment such as cellular telephones, SIM cards, computers, flash drives, external hard drives, multimedia devices, telex machines, facsimile machines, currency counting machines, and telephone answering machines to generate, transfer, count, record and/or store the information described in items a, b, d, e, and g above, and q and r below;

   i. That when drug distributors amass large proceeds from the sale of drugs, the drug distributors may attempt to legitimize these profits through various money laundering methods. To accomplish these goals, drug distributors utilize, including but not limited to, domestic and international banks and their attendant services, securities brokers, professionals

such as attorneys and accountants, casinos, real estate, shell corporations, business fronts, and otherwise legitimate businesses which generate large quantities of currency;

j.  That the sale of methamphetamine, cocaine, heroin, fentanyl, marijuana and other Controlled Dangerous Substances generates large quantities of United States currency in small denominations (commonly referred to as "street money");

k.  That it is common for drug distributors to physically handle and count the "street money" after receiving it in exchange for the Controlled Dangerous Substances, thereby leaving residue traces of Controlled Dangerous Substances on the "street money." Law enforcement agencies utilize dogs which are trained to react to the odor of Controlled Dangerous Substances and residue traces of Controlled Dangerous Substances; and that those trained dogs have reacted to narcotics tainted currency negotiated at banks and concealed in the residences of narcotics traffickers;

l.  That it is common for drug distributors to separate their "street money" by denomination and put this currency in rubber banded stacks in varying increments to facilitate quick counting;

m.  That it is recognized, and Courts have held, that the small and medium denominations of questionable currency, along with the manner in which the currency is handled, carried and concealed may establish probable cause that there is a substantial connection between the questionable currency and drug transactions, i.e. proceeds of illegal narcotic sales;

n. That the Currency Transaction Report (CTR) (IRS Form 4789), which is required to be completed and filed with the IRS by all financial institutions on every currency transaction which exceeds $10,000, causes tremendous problems for drug distributors when they attempt to negotiate their illegal profits at financial institutions;

o. That, in order to avoid the filing of a Currency Transaction Report, drug distributors often "structure" their currency transactions so that no one transaction exceeds $10,000, or they provide false or misleading information in an attempt to legitimize or conceal the source and/or ownership of the currency;

p. That drug distributors at times become fearful that their extravagant spending habits will bring them under scrutiny by the Internal Revenue Service or other federal, state, or local agencies. In order to legitimize their spending, these distributors file tax returns reporting income commensurate with the amount of money they have spent during the year, which they feel, can be traced and documented by the government. The "source" of their income reported on these returns is usually falsely stated, misleading or generic in terms. Retained copies of these returns are commonly kept by the traffickers in their residences and businesses;

q. That distributors of illegal drugs commonly maintain addresses or telephone numbers in books or papers ("ledgers") which reflect names, addresses and/or telephone numbers of their associates in the drug trafficking organization;

r. That drug distributors take or cause to be taken photographs of themselves, their associates, their property and their product. That these distributors usually maintain these photographs in their possession, or in their residences and/or vehicles;

    s. That the courts have recognized that unexplained wealth is probative evidence of crimes motivated by greed, in particular, trafficking in controlled substances;

    t. That drug distributors commonly have in their possession, that is, on their person, at their residences, in their vehicles, and/or their businesses, firearms, including but not limited to: handguns, pistols, revolvers, rifles, shotguns, machine guns and other weapons. Said firearms are used to protect and secure a drug distributor's property. Such property may include, but is not limited to: illegal drugs, jewelry, vehicles, narcotics paraphernalia, books, records, and United States currency;

    u. That the target(s) of this investigation are engaged in long-term, continuing criminal activities, namely offenses involving the distribution and possession with intent to distribute controlled substances, in violation of Title 21, United States Code, Section 841(a)(1), conspiracy to commit the aforementioned crimes, in violation of Title 21, United States Code, Section 846; and Title 18, United States Code, Section 1956(a)(1) (Laundering of Monetary Instruments)

    v. That the evidence sought through the use of the search warrant listed herein will provide investigators with admissible evidence of these crimes needed to establish the full scope and nature of the offenses being investigated; including determining the identity of members of the organization, the sources of supply, transportation methods, locations used to conceal drugs and the assets purchased from the proceeds derived from the sale of drugs; and,

    w. That there is probable cause to believe that such items of evidence, which represent the fruits and instrumentalities of said offenses, will be located within the location specified in this application, which is located within the Western District of Arkansas.

4.      The information contained in this affidavit is based upon information provided by other DEA special agents/TFOs, other federal, state and local law enforcement officers, public source documents, and your affiant's own personal investigation.

5.      The information contained in this affidavit is submitted for the sole purpose of establishing probable cause for a certain search warrant mentioned herein.  As a result, it does not contain every fact known to me concerning this investigation.

6.      Since this affidavit is for the limited purpose of establishing probable cause to support a search warrant, it contains only a summary of facts necessary to establish probable cause.  Your affiant has not included each and every fact known to your affiant concerning the entities, individuals, and the events described in this affidavit.

7.      The grounds for issuance of the search warrant are derived from your affiant's review of the physical evidence, discussions with participating agencies, and interviews of persons who have personal knowledge of the events described herein.

## INTRODUCTION AND AGENT BACKGROUND

8.      Your affiant is a Special Agent with the United States Department of Justice, Drug Enforcement Administration ("DEA") and has been employed with the DEA since June 2019.  Your affiant is a criminal investigator for the United States within the meaning of Title 21, United States Code, Section 878, and therefore your affiant is empowered to conduct investigations of, and make arrests for, the offenses enumerated in Title 21.  Accordingly, your affiant is a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a seizure warrant.

9. Your affiant began his career as a Special Agent with the DEA in October of 2019. Your affiant received sixteen weeks of training at the DEA Academy in Quantico, Virginia, where your affiant learned to identify various types of controlled substances by sight and odor; the way in which controlled substances are packaged, marketed, and consumed; drug testing; informant handling; evidence handling; search and seizure law; law involving conspiracy; and surveillance and investigation techniques.

10. Prior to your affiant's employment with the DEA, your affiant was employed by the North Little Rock, Arkansas, Police Department since 2007. During your affiant's employment with the North Little Rock Police Department, your affiant was assigned to the DEA Little Rock District Office as a Task Force Officer (TFO) from June 2014 until June 2019. Prior to your affiant's assignment as a DEA TFO, your affiant was assigned to the North Little Rock Police Department's Narcotics Unit from December 2009 until June 2014. Your affiant has been involved in numerous aspects of drug investigations, including, but not limited to, conducting controlled purchases of narcotics; utilizing confidential sources; debriefing defendants, witnesses, and informants; conducting surveillance and undercover operations; preparing and executing search warrants; analyzing documentary and physical evidence, analyzing phone toll records; and conducting wiretap investigations.

11. In the course of your affiant's career, your affiant has been the affiant of, and/or participated in, numerous search warrants involving the law enforcement seizure of controlled substances, documents associated with the sale of controlled substances and proceeds from the sale of illicit drugs.

12. Your affiant has personally conducted and/or assisted in over 200 investigations of criminal violations involving violations of the Federal Controlled Substances Act (Title 21, U.S.C. 841(a)(1) et. al.).

## PROBABLE CAUSE

13. On December 19, 2023, while conducting highway patrol on Interstate 40 (eastbound) near the Arkansas and Oklahoma state line, while within the Western District of Arkansas, Arkansas State Police (ASP) Captain (Capt.) Chris Goodman observed a white colored Chrysler Pacifica following too close to a silver-colored pickup truck. Once Capt. Goodman was able to catch up to this vehicle, he conducted a traffic stop on this vehicle near the #2 mile marker. This vehicle displayed Nevada license plate 099X97 (registered on a white 2023 Chrysler Pacifica, to EAN Holdings, LLC, at 14002 E. 21st Street, Ste 1500, Tulsa, OK 74134).

14. Capt. Goodman identified the driver of the vehicle as Edward GONZALEZ-Limones (Mexican ID card), and passenger as Pedro Vinicio CERDA-Aguirre (Mexican ID card). Capt. Goodman noted that both occupants seemed extremely nervous and that neither subject could produce a rental contract for this vehicle. Capt. Goodman stated the occupants informed him that one of CERDA-Aguirre's friends rented this vehicle in Las Vegas, Nevada.

15. During Capt. Goodman's road-side interview of GONZALEZ-Limones, GONZALEZ-Limones stated they were taking this vehicle to drop it off in Nashville, Tennessee. GONZALEZ-Limones stated once they dropped this vehicle off, they intended to fly back to Oklahoma City, Oklahoma, where they both lived.

16. Capt. Goodman then asked GONZALEZ-Limones for consent for law enforcement to search this vehicle. GONZALEZ-Limones granted Capt. Goodman consent to search. During the search, Capt. Goodman located five (5) large bundles of various suspected

drugs wrapped in white trash bags in the stow-and-go area of the vehicle. Capt. Goodman also located the Target Telephone in the center-console area of the vehicle. Capt. Goodman then placed both subjects under arrest.

17. Before Miranda warnings could be given to either subject, GONZALEZ-Limones informed Capt. Goodman that everything in the vehicle belonged to CERDA-Aguirre.

18. Both subjects were transported to the 12th/21st Judicial Drug Task Force (JDTF) office for further processing.

19. One of the bundles field-tested positive for the presence of methamphetamine, using a methamphetamine test-kit.

20. One of the bundles field-tested positive for the presence of cocaine, using a cocaine test-kit.

INTERVIEW OF CERDA-AGUIRRE

21. On December 19, 2023, DEA Special Agents (SA) Andy Chronister, Matt Barden Jr., and your Affiant met with CERDA-Aguirre at the 12th/21st JDTF office. ASP Trooper First Class (TFC) Rafael Guerra served as a Spanish-speaking translator during this interview. Both agents introduced themselves and showed CERDA-Aguirre their DEA-issued badges and credentials. This interview was recorded by an audio-recording device.

22. TFC Rafael Guerra advised CERDA-Aguirre of his Miranda Rights in Spanish, which CERDA-Aguirre stated he understood. CERDA-Aguirre agreed to speak with agents regarding this incident.

23. During this interview, CERDA-Aguirre admitted to knowing the vehicle he was a passenger in contained illegal drugs.

24. CERDA-Aguirre stated he previously agreed to transport this vehicle containing illegal drugs for payment. CERDA-Aguirre stated the person who agreed to pay him, and who was directing him to transport these illegal drugs was an unknown person in Mexico.

25. CERDA-Aguirre admitted to picking up this vehicle from an unknown person in Las Vegas, Nevada, at the direction of the person in Mexico. CERDA-Aguirre stated when he picked up this vehicle in Las Vegas, this vehicle already had illegal drugs inside.

26. CERDA-Aguirre stated he was directed to transport the illegal drugs to Nashville, Tennessee.

27. CERDA-Aguirre stated he received these instructions through communications over his cellular telephone (Target Telephone). CERDA-Aguirre unlocked the Target Telephone's lock screen and identified to agents the Mexico-based telephone number he received instructions from.

INTERVIEW OF GONZALEZ-LIMONES

28. On December 19, 2023, SAs Andy Chronister, Matt Barden Jr., and your Affiant met with GONZALEZ-Limones at the 12th/21st JDTF office. Agents introduced themselves and showed GONZALEZ-Limones their DEA-issued badges and credentials. This interview was recorded by an audio-recording device.

29. Your Affiant advised GONZALEZ-Limones of his Miranda Rights, which GONZALEZ-Limones stated he understood. GONZALEZ-Limones agreed to speak with agents regarding this incident.

30. During this interview, GONZALEZ-Limones admitted to knowing the vehicle he was driving at the time of the traffic stop contained illegal drugs.

31. GONZALEZ-Limones admitted he was being paid to assist CERDA-Aguirre in transporting these illegal drugs. GONZALEZ-Limones stated he believed that some of the illegal drugs were destined for Nashville, Tennessee, and some of the illegal drugs were destined for Charlotte, North Carolina.

**PHONE TO BE SEARCHED**

32. From training and by conducting numerous drug trafficking investigations, your Affiant is aware that traffickers of illegal narcotics frequently utilize cellular telephones to facilitate the purchase, transportation, and/or distribution of illegal narcotics. Specifically, your Affiant is aware the drug traffickers utilize multiple cellular telephones to communicate with co-conspirators during the transport of illegal narcotics to avoid detection and to differentiate between types of transactions, end-user and sources of supply. Furthermore, cellular telephones frequently contain names, text messages, voice mail messages, photographs, videos, and contact numbers for/of others involved in the distribution of illegal narcotics.

33. Further, it is both your Affiant's experience and the experience of other law enforcement officers your Affiant has spoken with, that a conspiracy to traffic narcotics generates various types of cellular telephone-related evidence. For example, the following types of evidence may be generated during the conspiracy: (1) telephone and direct contact numbers; (2) identifying information assigned to the device (including usernames, passwords and e-mail addresses); (3) call detail information (outgoing/incoming/missed calls); (4) internet protocol addresses accessed by the device or accessing the device; (5) stored photographs, videos and text messages; (6) stored electronic mail, including attachments, and voice messages and other recordings; (7) web browsing history and any stored web pages; (8) stored documents and other files; (9) stored geo-location information; and (10) data stored in any application.

34.     Based upon your Affiant's training and experience, your Affiant also knows that members of DTOs, including dealers, often use mobile phones to communicate with their narcotics source of supply and delivery recipients. Drug distributors often use SMS text messaging to communicate arrival and departure times, meeting places, details about narcotics, and details about other co-conspirators involved in the distribution of narcotics. Your Affiant has also observed drug distributors who photograph large sums of U.S. Currency and/or narcotics, which are then stored on the mobile device.

35.     Based upon your Affiant's training and experience, your Affiant's review of documents and other relevant information your Affiant believes to be reliable, discussions with other law enforcement officers and the facts supporting probable cause set as forth herein, your Affiant believes that evidence of the violation of Title 21, United States Code, Section 841(a)(1) and Title 21, United States Code, Section 846 is presently located on or within the cellular telephone device, described in Attachment A.

## TECHNICAL TERMS

36.     Based on your Affiant's training and experience, your Affiant uses the following technical terms to convey the following meanings:

a.     Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic

"address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

      b.     Based on your Affiant's training, experience, your Affiant knows that the devices have capabilities that allow it to serve as a wireless telephone. Your Affiant also knows the devices would allow to store text messages and digital images of, or related to, narcotics possession or distribution.

## ELECTRONIS STORAGE AND FORENSIC ANALYSIS

      37.     Based on your Affiant's knowledge, training, and experience, your Affiant knows that electronic devices can store information for long periods of time.

      38.     Forensic evidence. As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described in the warrant, but also forensic evidence that establishes how the device was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the device because:

      a.     Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence in analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

      b.      A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic device was used, the purpose of their use, who used them, and when.

      c.      The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a wireless telephone is evidence may depend on other information stored on the wireless telephone and the application of knowledge about how a wireless telephone operates. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

      d.      Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on storage medium.

      39.      Nature of examination. Based on the foregoing, and consistent with Federal Rule of Criminal Procedure 41(e)(2)(B), the warrant your Affiant is applying for would permit the examination of the device consistent with this warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

      40.      Manner of execution. Because this warrant seeks only permission to examine a device that is already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, your Affiant submits there is

reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

41. Based on the above information, your affiant has reason to believe that concealed within the Target Telephone which is further described in Attachment A, are items that constitute evidence, fruits, and instrumentalities of violations of Title 21, United States Code, Section 841(a)(1) (possession with intent to distribute a controlled substance), and Title 21, United States Code, Section 846 (conspiracy to commit controlled substance offense). Your Affiant further believes that a search of these target telephones will result in the discovery of items that constitute evidence, fruits, and instrumentalities of these activities, specifically, the items listed in Attachment B.

Further your Affiant sayeth not.

Respectfully submitted,

*M. Brooks*

Michael Brooks
DEA Special Agent

Subscribed and sworn to before me on January 8, 2024

*Mark E. Ford*

HONORABLE MARK E. FORD
UNITED STATES MAGISTRATE JUDGE